## Case No. 4,232.

EADS et al. v. The H. D. BACON.

[1 Newb. 274.][1]

District Court, D. Missouri. March, 1853.

Benjamin F. Hickman, for plaintiffs.

James S. Thomas, for owners of the boat Bacon.

WELLS, District Judge. No one has ever doubted that salvage services, when rendered at sea, or in the navigable rivers, where the tide ebbs and flows, were subjects of admiralty jurisdiction; but the doubt has been, whether the admiralty jurisdiction of the courts of the United States extended on the navigable rivers above where the tide was felt. The supreme court of the United States, in the case of The Thomas Jefferson, 10 Wheat.

---

[1] [Reported by John S. Newberry, Esq.]

[23 U. S.] 428, held that the admiralty jurisdiction did not extend above the tide-water. The Orleans v. Phoebus, 11 Pet. [36 U. S.] 175, is to the same effect. But in the recent case of The Genesee Chief v. Fitzhugh, 12 How. [53 U. S.] 443, and Fretz v. Bull [Id.] 446, the former cases were overruled, and the admiralty jurisdiction declared not to be limited by tide-water, but to extend to the lakes and navigable rivers of the United States—on the rivers, the same above as below tide-water. The last-mentioned case was one of collision on the Mississippi river. It was also contended by the proctor for the defendants, that this proceeding in rem (against the steamboat), could not be maintained, as it depended on a lien existing at the time of suit brought; and that, in this case, there was no existing lien, it having been lost by the salvors delivering up the vessel after raising it, and permitting the master to proceed upon the voyage to St. Louis. Several answers may be given to this objection: 1. The 19th rule prescribed by the supreme court of the United States for courts of admiralty, provides that, "In all suits for salvage, the suit may be in rem against the property saved, or the proceeds thereof, or in personam against the party at whose request and for whose benefit the salvage service has been performed." 2. That there is a difference between a right of retainer, merely, and a lien—that possession is not necessary to give validity to a lien—that for salvage services there is a lien. Cutler v. Rea, 7 How. [48 U. S.] 729. 3. Admitting that a lien may be abandoned, yet the mere fact that the master and crew of the Bacon were permitted to carry her into port, was no abandonment of the lien. It is nothing more than is usual and almost universal in salvage cases. Is a vessel saved from shipwreck at sea to be kept by the salvors at sea until a libel suit is commenced and the vessel seized? Was it necessary to keep the Bacon in the Mississippi river, one hundred miles below Cairo, until a suit could be brought and a writ served? Or were the salvors obliged to leave their own vessel and take possession of the Bacon and dispossess the master and crew, or failing to do so lose their lien? It would require the most unequivocal acts to satisfy the court, in this case, that the salvors intended to abandon their lien and resort to the owners, when the salvors did not even know who the owners were, or in what place or places they resided. The plaintiffs offered evidence to prove that the master of the Bacon had agreed to give them $4,000 for raising the boat.

The evidence consisted of the admissions and declarations of the master, whilst acting as master, after the arrival of the Bacon at St Louis, and before suit brought. The admissions and declarations were proved by one witness only. To this evidence, the proctor for defendants objected: 1. Because incompetent, the declarations and admissions of the master not being competent evidence to charge the owners; and 2. That the evidence of one witness was not sufficient to negative the answer of the owners, who therein denied the contract.

As to the first objection, the master, when upon a voyage, is the general agent of the owners, and they are bound by his acts. Abb. Shipp. 169, 219, note. "It is a general principle, that the acts of the master, at all events, bind the owner of the ship, as much as if the acts were committed by himself." Pages 169, 220, note. "When the progress of a voyage is interrupted by any casualty, such as capture, shipwreck, or other accidents, the master of the ship becomes, of necessity, an authorized agent for the owners, freighters, insurers, and all concerned. And whatever he undertakes, and whatever expenses he may incur, fairly directed to that purpose, become a charge upon them respectively, in the same manner as if incurred at their special request." The court has no doubt of the power of the master, as the agent of the owners, to use and employ, at their expense, every necessary means to save his sunken vessel. The admissions and declarations of an agent whilst acting as such, and within the scope of his authority, although made after the transaction to which they relate, are evidence against the principal. 2 Starkie, Ev. pt. 4, pp. 56, 57.

As to the second objection, the court is of the opinion that the absurd rule which prevails in chancery courts, that the answer of the defendant, at best only an interested witness, when responsive to the bill, is equal to two disinterested witnesses, or to one witness and other circumstances of equivalent force, does not prevail in the courts of admiralty. [Andrews v. Wall] 3 How. [44 U. S.] 572; 2 Conk. Adm. 620, 621, 622. Nor does it prevail in the admiralty courts even when the answer is responsive to interrogatories propounded.

But there is another answer to this objection, which is, that the rule in courts of chancery, above mentioned, is not applicable to a case like the present, where it is not alleged by the plaintiffs or defendants that the matter was within the personal knowledge of the latter. The plaintiffs state that the contract was made with the master, and that they have no knowledge of the owners. The owners do not allege that they were present on the occasion. Nor do the defendants, in their answer to the interrogatory, deny the contract; but state that "they believe and were so informed by said Henry Ealer (the master), that said petitioners said nothing about the charge they would make for raising said boat, and did not say they would charge $4,000." The court is, therefore, of opinion that the said evidence is competent and sufficient to prove the contract, and that a contract was made to pay $4,000 for raising said boat. Judge Conkling, in his valuable

work upon the jurisdiction, law and practice of the courts of the United States, in admiralty and maritime cases, lays down the law in regard to salvage contracts thus: "Contracts of this nature, however, are not held obligatory by courts of admiralty upon the owners of the property saved, unless it clearly appears that no advantage was taken of their situation, and that the rate of compensation is just and reasonable. In that case the stipulated rate of allowance will generally be adopted and enforced by the court, as just and conscientious;" and several adjudicated cases are cited. 1 Conk. Adm. 280. If the law be laid down correctly in the foregoing extract, it is manifest that a contract would have no force or effect whatever. For, if the compensation agreed upon must be proved to be just and reasonable, the same proof would insure a recovery for the same amount, without any contract—and this without any proof "that no advantage was taken of their situation." But there are certainly many adjudicated cases or dicta to that effect—as well as many ancient laws and usages. The Emulous [Case No. 4,480]; Bearse v. 340 Pigs Copper [Id. 1,193]; Schutz v. The Nancy [Id. 12,493]; Laws Oleron, art. 4, p. 29. The true principle by which such cases should be governed, would appear to this court, with great respect for others, to be that established in like cases in courts of equity; that is, that a contract should be presumed prima facie, to be fair, but if proven to be unconscionable, the court of admiralty, like the court of equity, would refuse to enforce it. But take either view of the law, it becomes necessary to look into the testimony in this case, to ascertain what compensation should be allowed; inasmuch as the defendants insist in their answer that the Bacon could have been raised without the assistance of the diving bell and apparatus, and that the charge of $4,000 is "extortionate, unreasonable and unjust," and that $2,000 would be a full, reasonable and just compensation.

Evidence on the part of the plaintiffs: Captain James Miller—now master of the steamboat Aleonia—been engaged in steamboating, on the western waters, twenty-seven years, the last twelve years as master of different steamboats; was along side of the Bacon after she sunk; remained there and took off part of her freight; did not believe it possible to raise her without the assistance of the diving bell; she was a badly sunk boat; she was badly bent from the after ends of the boilers to the bow; she was careened, and the water over one guard and part of the deck, whilst the other side was dry; she was a good deal worse sunk than the St. Paul. If the Bacon had been his boat, he would have been perfectly willing to give $4,000 to raise her; would have given $5,000 to raise her if she had belonged to him uninsured. Captain Eaton is agent for St. Louis board of underwriters, and has been such for upwards of three years. It is one of his duties to go to boats that are sunk or in perilous circumstances, and on which or on whose cargoes the St. Louis underwriters have any insurance, and to take means to save the boat and cargo; frequently made contracts with bell boats; customary to give a certain per cent. of the property saved; to ascertain what is a fair compensation, reference must be had to the value, difficulty of raising, and the danger of total loss; twenty per cent. of the net value of the cargo saved is the lowest salvage he has ever given a bell boat, and seventy-five the highest; considers $4,000 a reasonable charge for raising the Bacon; she was worth $20,000 as soon as raised, without repairs; the master of the Bacon contracted to pay McKinley fifty per cent. of the cargo of the Bacon as salvage; plaintiffs raised the steamer Pawnee, for which witness agreed to pay them fifty per cent; think it was more difficult to raise the Bacon than the Pawnee; speaks in high terms of the character and judgment of Capt. Miller; plaintiffs raised the Jewess and received fifty per cent. of her value; the amount of labor has nothing to do with the rate of compensation; the bell boat gets nothing if it does not succeed. Franklin L. Ridgley is president of the Union Insurance Company of St. Louis. Plaintiffs received for raising the St. Paul, $4,000; she was insured at the rate of $16,000; thinks the charge of the plaintiffs for raising the Bacon a moderate one; plaintiffs raised the steamboat Republic, worth about $4,500, and received $1,500, and got two-thirds of the cargo, worth at least $6,000; the steam pump of the diving bell Submarine, No. 4, throws from one hundred and fifty to two hundred barrels of water per minute; the Submarine No. 4, cost nearly $20,000; it was worth over $4,000 to raise the Bacon. The above named witnesses were all familiar with steamboating. It also appeared that the Louisville insurance offices had a standing contract with plaintiffs to pay them twenty per cent. on the insured value of boats raised by them, on which there was insurance in any of those offices, when under the value of twenty-two thousand dollars.

On the part of the defendants:—David B. Roach was carpenter on the Bacon when sunk; the boat sunk on Sunday morning, and the diving bell reached her on the following Saturday, in the afternoon; there was a hole in the bottom of the boat, about sixteen inches wide and eight feet long, tapering to a point at each end; commenced pumping a little after dark, on Saturday, and next morning she was afloat. Wm. McKinley was a passenger on the Bacon when she sunk; had been pilot, clerk and master at different times; went for the bell boat about two hundred miles down the river; made a contract with Henry Ealer, the master of the Bacon, by which he (witness) was to have one-half or fifty per cent. of the cargo saved; then considered the boat a total wreck; thinks the

said master was of the same opinion, as he went to Cairo to get boats on which to put the machinery of the Bacon; thinks $2,000 would be an exorbitant price for raising the Bacon; forms his opinion from what he understood was charged for similar services, and from his own knowledge of such services; the similar services alluded to were the raising the Sam Cloon, the Jewess, the Pawnee, the D. A. Givens; thinks his own compensation of fifty per cent. of the cargo, was a fair compensation. James Woodworth was engineer on the Bacon when it sunk; thinks $2,000 would be a big price for what was done in raising the Bacon. James Albright was mate on the Bacon when sunk, and yet is; thinks $4,000 a pretty big price for raising the Bacon, but don't know what it was worth; knows nothing about such services.

On the part of the plaintiff:—Charles F. Dickson knows plaintiffs received from the city of St. Louis $2,500, and the wreck of the Jewess (exclusive of boilers and machinery) for raising and removing her; plaintiffs received $2,500 for raising the D. A. Givens. It also appeared in evidence, that the cargo on board the Bacon was worth twenty-five or thirty thousand dollars, when sunk. The above is a very condensed statement of so much of the evidence as is deemed material to notice.

From the evidence, the court is of the opinion that the Bacon was badly sunk. This appears from the evidence of Captain Miller, Captain Eaton, and of the carpenter. It appears, also, that this was the opinion entertained by the master, as is apparent from the fact that he went to Cairo, a distance of about one hundred miles, to procure boats to receive and carry off the machinery of the Bacon; and from the fact that he contracted with McKinley to give him fifty per cent. of the cargo saved. McKinley also says that the master expected the boat to become a total wreck; McKinley was also of the same opinion. It appears also that it was usual to allow a per centum on the property saved; in other words, that the owners should pay in proportion to the benefit received. This is also the general rule adopted by courts of admiralty, in regard to salvage at sea. It also appears that twenty per cent. was the lowest salvage paid for raising boats by the diving bell; and that a much higher rate had frequently been allowed and paid. The Bacon, when raised, was worth, without repairs, at least $20,000; twenty per cent. on that value, would be $4,000, the amount claimed by the plaintiffs. The witnesses who testify on the part of the plaintiffs, declare that $4,000 was a moderate compensation for raising the Bacon. If they or their employers have any interest or feeling on the subject, it must be in favor of reducing the compensation for such services. But it is not merely a matter of opinion with them. They state what has been paid in many cases, and what is usual and customary, and the principles upon which their opinions are based; all of which are very satisfactory to the court. On the part of the defendants, the witnesses are, or were, all connected with the Bacon. McKinley thinks $2,000 would be an exorbitant price, but swears that the compensation of fifty per cent. on the cargo, allowed himself, was just and fair. His compensation would probably amount to eight or ten thousand dollars. There was neither ingenuity, skill or capital employed by him, and but little labor bestowed or expense incurred. He founds his opinion upon similar services, and the compensation allowed therefor; but it appears that the compensation in the cases alluded to by him, was greater than that claimed for raising the Bacon. The per cent. allowed was greater, although in some cases the amount received was less. In the case of the Pawnee, twenty-five per cent. was allowed, and it amounted to $4,000; that boat being valued at only $16,000. James Woodward, the engineer, thinks $2,000 would be a big price for what was done, but does not tell us why he thinks so; no doubt it was because the plaintiffs only worked some fifteen hours; nor does it appear that he knows anything about such services, or the principles upon which a compensation therefor is based. James Albright, the mate, thinks $4,000 a pretty big price, but frankly confesses he knows nothing about such services. It is stated by Captain Eaton, that to determine what is fair compensation, reference is had to the value of the property to be raised, the difficulty of raising it, and the danger of total loss. And that the labor expended by a diving bell does not enter into the account. The court is satisfied that these considerations form the true rule.

When persons, like the plaintiffs, by great ingenuity and skill, and at great expense, succeed in the construction of apparatus and machinery, by which a boat can be raised in twelve hours, which could not be raised at all without their machinery and apparatus, why should the owner of property complain of the shortness of the time employed? The sooner the property is raised out of the water, the better for the owners; long delay with many kinds of property, would be utter destruction to that property. The compensation which is allowed for marine salvage services does, and necessarily must depend upon other considerations. But there, no diving bells, costing some $20,000, are employed, and when not employed, going every day to decay. Property is not raised from the bottom of the sea, but only prevented from sinking. But yet in such cases, from twenty to fifty per cent. of the value of the property saved is usually allowed. The admiralty courts have never put the compensation upon the basis of pay for work and labor. It is and ever has been considered to the interest of commerce and navigation that lib-

eral compensation should be allowed salvors. Upon the whole case, the court is satisfied that $4,000 is only a reasonable and just compensation, and accordingly will allow that amount.